IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-72

No. 33A21

Filed 17 June 2022

THOMAS KEITH and TERESA KEITH

v.

HEALTH-PRO HOME CARE SERVICES, INC.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 275 N.C. App. 43 (2020), reversing a judgment entered on 11 April 2018 by Judge Marvin K. Blount in Superior Court, Pitt County, and remanding for an order granting defendant's motion for judgment notwithstanding the verdict. Heard in the Supreme Court on 16 February 2022.

*Ward and Smith, P.A., by Jeremy M. Wilson, Alex C. Dale, and Christopher S. Edwards, for plaintiff-appellants.*

*Hedrick Gardner Kincheloe & Garofalo LLP, by M. Duane Jones, Michael S. Rothrock, and Linda Stephens, for defendant-appellee.*

*Van Winkle, Buck, Wall, Starnes & Davis, P.A., by Heather Whitaker Goldstein, for the National Academy of Elder Law Attorneys and the North Carolina Chapter of the National Academy of Elder Law Attorneys, amici curiae.*

*Fox Rothschild LLP, by Troy D. Shelton, for the National Center for Victims of Crime, amicus curiae.*

*The Sumwalt Group, by Vernon Sumwalt, and White & Stradley, PLLC, by J. David Stradley, for the North Carolina Advocates for Justice, amicus curiae.*

*Parker Poe Adams & Bernstein LLP, by Jonathan E. Hall, Emily L. Poe, and Steven C. Wilson, for North Carolina Association of Defense Attorneys, North*

*Carolina Retail Merchants Association and the Chamber Legal Institute, amici curiae.*

BARRINGER, Justice.

¶ 1     In this matter, we must consider whether the Court of Appeals erred by reversing the judgment in favor of plaintiffs and remanding to the trial court for entry of an order granting defendant's motion for judgment notwithstanding the verdict and by determining that the trial court erred by denying defendant's requested instruction. After careful review of the record, we find that plaintiffs submitted sufficient evidence for each element of the claim.

¶ 2     Employers are in no way general insurers of acts committed by their employees, but as recognized by our precedent, an employer may owe a duty of care to a victim of an employee's intentional tort when there is a nexus between the employment relationship and the injury. Here, when the evidence is viewed in the light most favorable to the plaintiffs, plaintiffs, who are an elderly infirm couple that contracted with a company to provide them a personal care aide in their home, have shown a nexus between their injury and the employment relationship. The employee was inadequately screened and supervised, being placed in a position of opportunity to commit crimes against vulnerable plaintiffs after her employer suspected her of stealing from plaintiffs. Therefore, we conclude that the Court of Appeals erred by reversing the judgment in favor of plaintiffs and by remanding for entry of a judgment notwithstanding the verdict in favor of defendant. Further, the Court of Appeals

misinterpreted North Carolina precedent, and thus erred by holding the trial court erred by denying defendant's requested instructions.

## I.  Background

On 29 September 2016, plaintiffs Thomas and Teresa Keith (Mr. and Mrs. Keith), an elderly married couple with health and mobility issues, were the victims of a home invasion and armed robbery orchestrated by a personal care aide working for defendant Health-Pro Home Care Services, Inc. (Health-Pro). The aide, Deitra Clark, was assigned to assist the Keiths in their home. Clark subsequently pleaded guilty to first-degree burglary and second-degree kidnapping for her conduct.

In December 2016, the Keiths sued Health-Pro for negligence and punitive damages. The Keiths alleged that they hired Health-Pro as their in-home health care provider and "[d]espite Deitra Clark's criminal record, lack of a driver's license, and history of prior incidents [of suspected prior thefts from the Keiths' home], Health-Pro negligently allowed Deitra Clark to provide in-home care to the Keiths, and Health-Pro's conduct in assigning Deitra Clark to these responsibilities, as opposed to some other position in the company, was a proximate cause of the robbery of the Keiths and the consequent injuries sustained by them."

The case proceeded to trial and was tried before a jury at the 19 March 2018 session of superior court in Pitt County. At the conclusion of the Keiths' presentation of evidence, Health-Pro moved for directed verdict on the negligence claim pursuant

to North Carolina Rule of Civil Procedure 50. Health-Pro argued that:

> As far as negligence, your Honor, we would contend there has been no evidence to meet the Plaintiffs' burden of proof. My understanding from the proposed jury instructions that the Plaintiffs have passed up is they treat this as an ordinary negligence case. The Defense contends this is negligence [sic] hiring retention and supervision case, which is part of our proposed instructions. That's very similar to what the Plaintiffs have pled. That type of case is what has essentially been argued to this jury and that's what the evidence has revealed. In order to succeed on that case . . . and even in an ordinary negligence case the Plaintiffs have to show that the events of September 29th, 2016, and Deitra Clarks' unfitness and participation in those events were foreseeable to my clients. Those are the events that have caused the Plaintiffs the only injury they complain of. And there is nothing in the record that suggests that it was foreseeable.

¶ 6        The trial court denied Health-Pro's motion for directed verdict at the close of the Keiths' evidence.

¶ 7        At the close of all evidence, Health-Pro renewed its motion for a directed verdict. The trial court denied the motion.

¶ 8        The trial court then held a charge conference for the jury instructions. As relevant to this appeal, the trial court proposed using for the negligence issue North Carolina Pattern Jury Instructions 102.10, 102.11, 102.19, and 102.50, which included an instruction on the general common law of negligence. Health-Pro objected to the foregoing Pattern Jury Instructions and instead requested Pattern Jury Instruction 640.42, entitled Employment Relationship - Liability of Employer for

Negligence in Hiring, Supervision or Retention of an Employee. N.C.P.I.–Civil 640.42 (2009). Health-Pro's counsel contended that this is a negligent hiring case,[1] not an ordinary negligence case, and tendered its proposed instruction to the trial court in writing. The Keiths disagreed, arguing that their complaint pleaded an ordinary negligence claim and the facts in the case were beyond the Pattern Jury Instruction for negligent hiring. The trial court denied Health-Pro's requested jury instruction and instructed the jury in accordance with the trial court's proposed instruction.

¶ 9        After hearing the instructions from the trial court and deliberating, the jury returned a verdict in favor of the Keiths. The jury answered in the affirmative that both Mr. and Mrs. Keith were injured by the negligence of Health-Pro. The jury found Mr. Keith entitled to recover $500,000 in damages from Heath-Pro for his personal injuries and found Mrs. Keith entitled to recover $250,000 in damages from Health-Pro for her personal injuries. The trial court then entered judgment to this effect on 11 April 2018.

¶ 10        Health-Pro subsequently moved for judgment notwithstanding the verdict under North Carolina Rule of Civil Procedure 50 and, in the alternative, for a new trial pursuant to North Carolina Rule of Civil Procedure 59. The trial court denied

---

[1] Like the Court of Appeals, we will use the shorthand "negligent hiring" to refer to the doctrine that includes negligent hiring, retention, and supervision for ease of reading. *See Keith v. Health-Pro Home Care Servs., Inc.*, 275 N.C. App. 43, 47 n.1 (2020). Similarly, we use the term "hiring" to refer to and include hiring, retention, and supervision.

these post-trial motions on 3 May 2018. Health-Pro appealed the 11 April 2018 judgment and the 3 May 2018 order denying the post-trial motions.[2]

¶ 11 On appeal, a divided panel of the Court of Appeals reversed the judgment and remanded for entry of a judgment notwithstanding the verdict in Health-Pro's favor. *Keith v. Health-Pro Home Care Servs., Inc.*, 275 N.C. App. 43, 44 (2020).

¶ 12 To address Health-Pro's appeal of the trial court's denial of its motions for directed verdict and motion for judgment notwithstanding the verdict, the Court of Appeals determined that it "must first decide whether [the Keiths'] case was appropriately presented to the jury as an 'ordinary' negligence claim instead of an action for negligent hiring." *Id.* at 48–49. The Court of Appeals considered the allegations in the Keiths' complaint and the evidence presented at trial "within the context of precedent governing both ordinary negligence and negligent hiring." *Id.* at 51. The Court of Appeals ultimately indicated that it agreed with Health-Pro that the Keiths' "allegations and the facts of this case constituted a claim for negligent hiring," obligating the Keiths to prosecute their claim as one for negligent hiring. *Id.* at 61. The Court of Appeals explained as follows:

> *All* of Plaintiffs' relevant allegations and evidence directly challenge whether Defendant should have hired Ms. Clark as an in-home aide; whether Defendant acted appropriately in response to hearing from Plaintiffs that

---

[2] The Keiths also appealed an issue to the Court of Appeals, but that issue has not been appealed to this Court. *Keith*, 275 N.C. App. at 44. Thus, we have omitted discussion of the Keiths' appeal.

money had been taken from their home on two occasions—
which would have involved either greater supervision of—
such as moving Ms. Clark to a no-client-contact position, as
suggested by Plaintiffs—or a decision regarding whether to
retain her in Defendant's employ at all. Plaintiffs have
cited no binding authority for the proposition that an action
brought on allegations, and tried on facts, that clearly fall
within the scope of a negligent hiring claim may avoid the
heightened burden of proving all the elements of negligent
hiring by simply designating the action as one in ordinary
negligence, and we find none.

*Id.* at 64–65.

¶ 13        As such, the Court of Appeals held that the trial court erred by denying Health-Pro's motions for directed verdict and judgment notwithstanding the verdict "with respect to ordinary negligence, as that claim was not properly before the trial court, and no evidence could support it." *Id.* at 66. Given the Court of Appeals' conclusion that the Keiths' claim was not one of ordinary negligence, the Court of Appeals also held that it was error to deny Health-Pro's requested jury instruction on negligent hiring. *Id.* at 65.

¶ 14        The Court of Appeals then considered whether the Keiths' evidence was sufficient to survive a motion for judgment notwithstanding the verdict "based upon the theory of negligent hiring." *Id.* at 66. It began by discussing the Court of Appeals' case *Little v. Omega Meats I, Inc.*, 171 N.C. App. 583 (2005), which this Court affirmed per curiam without written opinion, 360 N.C. 164 (2005). *Keith*, 275 N.C. App. at 66–67.

¶ 15          The Court of Appeals concluded that according to *Little*, "three specific elements . . . must be proven [by a plaintiff] in order to show that an employer had a duty to protect a third party from its employee's negligent or intentional acts committed outside of the scope of the employment." *Id.* at 67. Specifically,

> (1) the employee and the plaintiff must have been in places where each had a right to be when the wrongful act occurred; (2) the plaintiff must have met the employee, when the wrongful act occurred, as a direct result of the employment; and (3) the employer must have received some benefit, even if only potential or indirect, from the meeting of the employee and the plaintiff that resulted in the plaintiff's injury.

*Id.* (cleaned up). The Court of Appeals held that there was no evidence to support any of the three elements in this case. *Id.* at 68.

¶ 16          Next, the Court of Appeals concluded that even if the requirements of *Little* are not applicable to this case, the trial court still erred by denying Health-Pro's motion for judgment notwithstanding the verdict based on a theory of negligent hiring. *Id.* at 69. Specifically, the Court of Appeals held that Health-Pro had no duty to protect the Keiths' from Clark's criminal acts on 29 September 2016, *id.* at 82, and the Keiths' "evidence was insufficient to demonstrate proximate cause," *id.* at 83.

¶ 17          The dissent disagreed with the majority's holding that the judgment in favor of the Keiths must be reversed and that Health-Pro was entitled to judgment as a matter of law. *Id.* at 84 (Dillon, J., dissenting). The dissent contended that although the Keiths alleged that Health-Pro was negligent in hiring Clark, the evidence of

negligent hiring "is merely a means by which a plaintiff proves ordinary negligence." *Id.* "[N]egligent [hiring] (like any other ordinary negligence claim) requires a plaintiff to show that the defendant owed a duty, that the defendant breached that duty, and that the plaintiff suffered an injury proximately caused by the breach." *Id.*

¶ 18        Further, the dissent argued that when viewed in the light most favorable to the Keiths, the evidence was sufficient to make out an ordinary negligence claim based on their evidence of Health-Pro's negligent hiring of a dishonest employee. *Id.* Unlike the majority, the dissent concluded that the Keiths did not have to prove that the robbery occurred while Clark was on duty. *Id.* The evidence was sufficient for a negligence claim because when viewed in the light most favorable to the Keiths, Health-Pro's "dishonest employee use[d] 'intel' learned while on duty to facilitate a theft." *Id.*

¶ 19        The dissent asserted its view that the majority misread *Little*, *id.* at 87–88, and analyzed how the evidence when viewed in the light most favorable to the Keiths, as the non-moving party, is sufficient for each element, rendering denial of the motions for directed verdict and judgment notwithstanding the verdict proper, *id.* at 86–91.

¶ 20        Further, as to the jury instructions, the dissent stated:

> The trial court's actual instruction was a correct statement of the law in this case, as Plaintiffs claim was one in ordinary negligence. But it would not have necessarily been inappropriate for the trial court to

expound on some of the elements, provided the requested instructions were a correct statement of the law as supported by the evidence. I disagree, though, that the instruction on duty requested by Defendant, though maybe appropriate in certain negligent [hiring] cases, would have been appropriate in this case. No one disputes that the "wrongful act" occurred when Ms. Clark had no right to be in Plaintiffs' home. However, as explained above, it was enough for Plaintiffs to show that Ms. Clark used intel learned while she was on the job to facilitate the robbery which occurred after she had left work for the day. Accordingly, the instructions requested by Defendant would have confused the jury. If followed by the jury, the instructions would have necessarily resulted in a verdict for Defendant. In fact, if the instructions were an accurate statement of the law, as applied to the evidence in this case, then Defendant would have been entitled to judgment as a matter of law. Based on the requested instructions, Defendant owed no duty to Plaintiffs *solely* because the robbery occurred when Ms. Clark was off the clock, and therefore could not be held liable, notwithstanding that Defendant had been negligent in continuing to place Ms. Clark in Plaintiffs' home, that Ms. Clark provided the intel learned while placed in Plaintiffs' home to the perpetrators to facilitate the break-in, that it was foreseeable that Ms. Clark would try and steal from Plaintiffs again, and that the break-in would not have otherwise occurred.

*Id.* at 92–93.

The dissent acknowledged that reasonable minds may reach different conclusions concerning Health-Pro's liability for the criminal conduct of Clark in this case, but that decision was for the jury, and the jury has spoken in this case in favor of liability. *Id.* at 93.

The Keiths appealed based on the dissent pursuant to N.C.G.S. § 7A-30(2).

## II.    Standard of Review

Pursuant to North Carolina Rule of Appellate Procedure 16, this Court "reviews the decision of the Court of Appeals to determine whether it contains any errors of law." *State v. Melton*, 371 N.C. 750, 756 (2018) (citing N.C. R. App. P. 16(a); *State v. Mumford*, 364 N.C. 394, 398 (2010)). The Court of Appeals' majority and dissent disagreed on whether the trial court erred by denying Health-Pro's motions for directed verdict and judgment notwithstanding the verdict under North Carolina Rule of Civil Procedure 50 and by denying Health-Pro's requested jury instruction under North Carolina Rule of Civil Procedure 51. The Keiths appealed based on this disagreement. Therefore, we address each of these issues. *See* N.C. R. App. P. 16(a), (b).

## III.    Analysis

### A. Health-Pro's Rule 50 Motions

To address the issues before us, we must summarize the relevant aspects of the law of this State concerning negligence and negligent hiring. The common law claim of negligence has three elements: (1) a legal duty owed by the defendant to the plaintiff, (2) a breach of that legal duty, and (3) injury proximately caused by the breach. *Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 328 (2006); *Kientz v. Carlton*, 245 N.C. 236, 240 (1957). Precedent decided by this Court further defines the contours of these three elements. For instance, this Court has recognized that

"[n]o legal duty exists unless the injury to the plaintiff was foreseeable and avoidable through due care." *Stein*, 360 N.C. at 328.

¶ 25        Given this limitation, a defendant rarely has a legal duty to prevent the criminal acts of others. *Id.* However, "a defendant may be liable for the criminal acts of another when the defendant's relationship with the plaintiff or the third person justifies making the defendant answerable civilly for the harm to the plaintiff." *Id.* at 329. For example, this Court has recognized that a common carrier owes to its passengers a duty to provide for their safe conveyance and that, in the performance of its duty, it must protect a passenger from assault by the carrier's employees and intruders when by the exercise of due care, the acts of violence could have been foreseen and avoided. *See Smith v. Camel City Cab Co.*, 227 N.C. 572, 574 (1947). Similarly, a store owner owes to a customer on its premises during business hours for the purpose of transacting business thereon a duty to protect or warn the customer of endangerment from the criminal acts of third persons when reasonably foreseeable by the store owner and when such acts could have been prevented by the exercise of ordinary care by the store owner. *Foster v. Winston-Salem Joint Venture*, 303 N.C. 636, 638–40 (1981).

¶ 26        In the context of employment, this Court held that a defendant employer owes its employees the duty to exercise reasonable care in its employment and retention of employees, and if there be negligence in this respect, which is shown to be proximate

cause of the injury to the employee, the defendant employer may be liable for the injury caused by the negligence of the fellow employee, *Walters v. Durham Lumber Co.*, 163 N.C. 536, 541 (1913), or by the intentional torts of the employer's supervisors, *Lamb v. Littman*, 128 N.C. 361, 362–65 (1901). Later precedent recognized that an employer's duty to exercise reasonable care in its employment and retention of employees could extend to third persons. *See Braswell v. Braswell*, 330 N.C. 363, 373 (1991) (quoting *O'Connor v. Corbett Lumber Corp.*, 84 N.C. App. 178, 182–83 (1987)); *Medlin v. Bass*, 327 N.C. 587, 590 (1990).

In *Braswell* and *Medlin*, this Court expressly recognized that North Carolina courts have recognized a cause of action for negligent hiring. *Braswell*, 330 N.C. at 373; *Medlin*, 327 N.C. at 590. In *Medlin*, this Court delineated what a plaintiff must prove for this claim:

> (1) the specific negligent act on which the action is founded . . . (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in 'oversight and supervision,' . . . and (4) that the injury complained of resulted from the incompetency proved.

327 N.C. at 591 (emphasis omitted) (quoting *Walters*, 163 N.C. at 541).

In *Little*, the Court of Appeals addressed whether there was sufficient evidence for a claim by third-person plaintiffs for negligent hiring against a defendant

employer when the injury causing acts were intentional torts and criminal. 171 N.C. App. at 584–90. The Court of Appeals held that on the record before it, the defendant employer did not owe plaintiffs a duty of care and affirmed the trial court's granting of directed verdict in the defendant employer's favor. *Id.* at 589. The Court of Appeals explained:

> In the instant case Smith[, an independent contractor for defendant employer Omega,] was not in a place where he had a legal right to be since he broke in to plaintiffs' home; Smith and plaintiffs did not meet as a direct result of Smiths' relationship with defendants, since he did not enter plaintiffs' home as a salesman; finally, defendants received no benefit, direct, indirect or potential, from the tragic "meeting" between Smith and plaintiffs. We have found no authority in North Carolina suggesting that defendants owed plaintiffs a duty of care on these facts, and we hold that in fact none existed.
>
> We refuse to make employers insurers to the public at large by imposing a legal duty on employers for victims of their independent contractors' intentional torts that bear no relationship to the employment. We note that because this is a direct action against the employer, for the purposes of this appeal the result would be the same if Smith had been an employee of defendants instead of an independent contractor. Smith could have perpetrated the exact same crimes against these plaintiffs, in the exact same manner, and with identical chances of success, on a day that he was not selling Omega's meats and driving Omega's vehicle.

*Id.* at 588–89.

Prior to this analysis and holding, the Court of Appeals quoted three sentences from an article published in the Minnesota Law Review:

> Most jurisdictions accepting the theory of negligent hiring have stated that an employer's duty to select competent employees extends to any member of the general public who comes into contact with the employment situation. Thus, courts have found liability in cases where employers invite the general public onto the business premises, or require employees to visit residences or employment establishments. One commentator, in analyzing the requisite connection between plaintiffs and employment situations in negligent hiring cases, noted three common factors underlying most case law upholding a duty to third parties: (1) the employee and the plaintiff must have been in places where each had a right to be when the wrongful act occurred; (2) the plaintiff must have met the employee as a direct result of the employment; and (3) the employer must have received some benefit, even if only potential or indirect, from the meeting of the employee and the plaintiff.

*Id.* at 587–88 (quoting Cindy M. Haerle, *MINNESOTA DEVELOPMENTS: Employer Liability for the Criminal Acts of Employees Under Negligent Hiring Theory: Ponticas v. K.M.S. Investments*, 68 Minn. L. Rev. 1303, 1308–09 (1984)). Citing this Article, the Court of Appeals in *Little* further stated, "[c]ourts in other jurisdictions have generally, though not exclusively, declined to hold employers liable for the acts of their independent contractors or employees under the doctrine of negligent hiring or retention when *any one* of these three factors was not proven." *Id.* at 588 (citing 68 Minn. L. Rev. 1303, 1308–09).

The dissent in *Little* contended that "our courts have already established a duty on the part of employers of independent contractors and that the majority opinion's conclusion that there is no duty in this case—as a matter of law—cannot be

reconciled with this authority." *Id.* at 591–92 (Geer, J., dissenting). This Court affirmed per curiam the Court of Appeals' decision. *Little v. Omega Meats I, Inc.*, 360 N.C. 164, 164 (2005).

¶ 31        In the case before us, the Court of Appeals interpreted the aforementioned statements in *Little* as having "identified three specific elements that must be proven in order to show that an employer had a duty to protect a third party from its employee's negligent or intentional acts committed outside of the scope of the employment." *Keith*, 275 N.C. App. at 67. We hold that the Court of Appeals erred by reading *Little* as adopting such rigid requirements for reasons similar to those that the Court of Appeals' dissent in this case raised. *See id.* at 87 (Dillon, J., dissenting).

¶ 32        In *Little*, the Court of Appeals quoted a statement from a Minnesota Law Review article that "*[o]ne commentator . . .* noted three common *factors* underlying *most* case law upholding a duty to third parties" and cited this article for support that there is a *general*, but *not exclusive*, trend in other jurisdictions related to these factors. *Little*, 171 N.C. App. at 588 (emphasis added).[3] The Court of Appeals' analysis

---

[3] The Minnesota Law Review article cited as the "[o]ne commentator" a note by a Chicago-Kent Law Review staff member from 1977. Cindy M. Haerle, *MINNESOTA DEVELOPMENTS: Employer Liability for the Criminal Acts of Employees Under Negligent Hiring Theory: Ponticas v. K.M.S. Investments*, 68 Minn. L. Rev. 1303, 1308–09 (1984) (citing John C. North, Note, *The Responsibility of Employers for the Actions of Their Employees: The Negligent Hiring Theory of Liability*, 53 Chi-Kent L. Rev. 717, 724 (1977)). While published scholarship by law students and their attempts to deduce patterns in the holdings of various court rulings can be informative, such observations do not mean that other jurisdictions have adopted these three factors as requirements. On the same page as its description of the factors, the Minnesota Law Review article expressly recognized the lack of predictive

in *Little* implicitly reflected consideration of these factors, but the Court of Appeals indicated that its decision turned on the lack of "authority in North Carolina suggesting that defendants owed plaintiffs a duty of care *on these facts*." *Id.* (emphasis added).

¶ 33        The Court of Appeals did not state that it adopted these factors. It further did not even describe other jurisdictions as holding these factors to be elements. Nowhere in the *Little* decision did it state that these factors must be alleged, proven, or shown in courts of this State to establish an employer's duty to a third-party injured by an employee to exercise reasonable care in its hiring of employees. *Cf. Walters*, 163 N.C. at 541 (using the terms "it is shown" and "must be established" when addressing an employer's liability). Nor is it said that these factors are required. Rather, the Court of Appeals "refuse[d] to make employers insurers to the public at large by imposing a legal duty on employers for victims of their independent contractors' intentional torts that bear no relationship to the employment," and thus "required [for a duty to third

---

relevance of one of these factors in determining when courts find an employer owes a duty of care to a particular plaintiff. *Id.* at 1309. The cases cited by *Little* in addition to the Minnesota Law Review article also do not identify or adopt a three-factor test. *Little v. Omega Meats I, Inc.*, 171 N.C. App. 583, 588 (2005) (citing *McLean v. Kirby Co.*, 490 N.W.2d 229 (N.D. 1992); *Baugher v. A. Hattersley & Sons, Inc.*, 436 N.E.2d 126, 129 (Ind. Ct. App. 1982); *Parry v. Davidson-Paxon Co.*, 73 S.E.2d 59 (Ga. Ct. App. 1952); *Goforth v. Off. Max*, No. L97-2972, 1999 WL 33722384 (Va. Cir. Ct. Apr. 16, 1999)). Regardless, while we need not and do reach not this issue, we observe as set forth in more detail that in this case, there is evidence reflecting that the Keiths and Clark met through her employment as their personal care aide; the Keiths paid defendant for Clark's services; and at the time of the armed robbery, the Keiths were in their home, and Clark was in her car awaiting her accomplices.

parties for negligent hiring] a nexus between the employment relationship and the injury." *Little*, 171 N.C. App. at 588–89. The *Little* court considered these factors, in the absence of existing North Carolina law, in determining whether there is a sufficient nexus between the employment relationship and the injury, but it did not adopt a requirement that all three factors be proven.

¶ 34 Thus, the Court of Appeals in this case erred by reading *Little* to have "identified three specific elements that must be proven," and by declining "to hold employers liable for the acts of their employees under the doctrine of negligent hiring or retention when any one of these three factors was not proven." *Keith*, 275 N.C. App. at 67 (cleaned up).

¶ 35 The Court of Appeals further erred by holding that the trial court erred by denying Health-Pro's motions for directed verdict and judgment notwithstanding the verdict. *Id.* at 66. The Court of Appeals agreed with defendant that the Keiths' were obligated to prosecute their claim as one for negligent hiring because the Keiths' allegations and facts of this case constituted a claim for negligent hiring. *Id.* at 61. However, this conclusion and the analysis supporting it failed to properly apply the standard of review for Rule 50 motions, the matter before the Court of Appeals.

¶ 36 The standard of review for Rule 50 motions is well-established. Motions for directed verdict and judgment notwithstanding verdict are questions of law that appellate courts review de novo. *Desmond v. News & Observer Publ'g Co.*, 375 N.C.

21, 41 (2020). On appeal, the standard of review for both motions is the same: "whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury." *Davis v. Dennis Lilly Co.*, 330 N.C. 314, 322–23 (1991). "In determining the sufficiency of the evidence to withstand a motion for a directed verdict, all of the evidence which supports the non-movant's claim must be taken as true and considered in the light most favorable to the non-movant, giving the non-movant the benefit of every reasonable inference which may legitimately be drawn therefrom and resolving contradictions, conflicts, and inconsistencies in the non-movant's favor." *Turner v. Duke Univ.*, 325 N.C. 152, 158 (1989). "If, after undertaking such an analysis of the evidence, the [court] finds that there is evidence to support each element of the nonmoving party's cause of action, then the motion for directed verdict and any subsequent motion for judgment notwithstanding the verdict should be denied." *Abels v. Renfro Corp.*, 335 N.C. 209, 215 (1993).

¶ 37　　Even when addressing an argument by Health-Pro that the negligence claim in this case is in fact a negligent hiring claim, a Rule 50 motion turns on the sufficiency of the evidence at the trial. Thus, we analyze the evidence at trial to assess whether there is support for each element of the nonmoving party's cause of action.[4]

---

[4] In addition to analyzing the evidence at trial, the Court of Appeals analyzed the pleadings and justified its review and analysis of the pleadings on *Burton v. Dixon,* 259 N.C. 473 (1963) and *CommScope Credit Union v. Butler & Burke, LLP,* 369 N.C. 48 (2016). *Keith,*

¶ 38 The evidence at trial tended to show the following when viewed in the light most favorable to the nonmoving party, the Keiths. The Keiths were an elderly couple with serious health issues and limited mobility. Mr. Keith had just undergone heart surgery when they sought an at-home-care provider. The Keiths and their son, Fred Keith (Fred), met with Health-Pro's sole owner, Chief Executive Officer, and President, Sylvester Bailey III (Mr. Bailey). Health-Pro provided at-home personal and health care. During that meeting, Health-Pro, through Mr. Bailey, informed them that all employees undergo criminal background checks. After the meeting, the Keiths hired Health-Pro for their services in December 2012.

¶ 39 In 2015, Health-Pro received an employment application from Clark and permission to conduct a criminal background check. Pursuant to State law, "[a]n offer of employment by a home care agency licensed under [Chapter 131E on Health Care Facilities and Services] to an applicant to fill a position that requires entering the

275 N.C. App. at 51–54. *Burton* and *CommScope* addressed objections to the sufficiency of a pleading to state a claim. *CommScope,* 369 N.C. at 51; *Burton,* 259 N.C. at 476–77. This matter reaches us well past that stage. Thus, these cases do not inform our analysis. We are reviewing motions for directed verdict and judgment notwithstanding the verdict, which are made during and after a trial. Further, Health-Pro did not object to any of the evidence as outside the scope of the pleadings. Pursuant to North Carolina Rule of Civil Procedure 15(b), "[w]hen issues not raised by the pleadings are tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." N.C.G.S. § 1A-1, Rule 15(b) (2021). Thus, even if evidence addressed issues beyond the scope of the pleadings, we must treat them as if raised in the pleadings pursuant to Rule 15(b) on account of the Keiths' and Health-Pro's implied consent. Therefore, we need not concern ourselves with the pleadings, and, instead, consistent with the standard of review for the matter before us, we concern ourselves with the evidence at trial.

patient's home is conditioned on consent to a criminal history record check of the applicant." N.C.G.S. § 131E-265(a) (2021).

¶ 40     Health-Pro's criminal background investigation policy was that "[a]ll employees of Health-Pro must undergo a criminal background check by the State Bureau of Investigation or other approved entity" and "[i]f the criminal history involves a felony not listed above, a misdemeanor, a series of arrests, or a criminal conviction greater than seven years, the agency will review the offense, its relevance to the particular job performance, and to the length of time between conviction and the employment date." Further, "[a] decision regarding employment will be reached only after the nature, severity and date of the offense have been carefully evaluated."

¶ 41     Similarly, under State law,

> [w]ithin five business days of making [a] conditional offer of employment, a . . . home care agency shall submit a request to the Department of Public Safety under [N.C.]G.S. [§] 143B-939 to conduct a State or national criminal history record check required by [N.C.G.S. § 131E-265], or shall submit a request to a private entity to conduct a State criminal history record check required by [N.C.G.S. § 131E-265].

N.C.G.S. § 131E-265(a). "If an applicant's criminal history record check reveals one or more convictions of a relevant offense, the . . . home care agency . . . shall consider [the enumerated] factors [in this section] in determining whether to hire the applicant[.]" N.C.G.S. § 131E-265(b). Relevant offense is defined as "a county, state, or federal criminal history of conviction or pending indictment of a crime, whether a

misdemeanor or felony, that bears upon an individual's fitness to have responsibility for the safety and well-being of aged or disabled persons." N.C.G.S. § 131D-40(d) (2021); *see* N.C.G.S. § 131E-265(d) ("As used in this section, the term 'relevant offense' has the same meaning as in [N.C.]G.S. [§] 131D-40."). "An entity and officers and employees of an entity shall be immune from civil liability for failure to check an employee's history of criminal offenses if the employee's criminal history record check is requested and received in compliance with [N.C.G.S. § 131E-266.]" N.C.G.S. § 131E-265(g).

¶ 42        Health-Pro admitted that it did not run a criminal background check with the State Bureau of Investigation or other approved entity and admitted that the review and evaluation required by the policy was not completed. However, Health-Pro contended it ran a criminal background check and was aware of Clark's misdemeanor convictions and other charges. To the contrary, the only document in Health-Pro's employment file relating to a criminal background check was one page and only showed the following:[5]

---

[5] This document has been redacted for purposes of this opinion to remove irrelevant personal information.

**Criminal Records**

7 | Criminal Records

**Likely Matches:**
These records have the same name and date of birth as the person you selected. In most cases, this is a strong indicator that the person you selected is also the person in the result below.

| # | Name | Age | Address | DOB |
|---|------|-----|---------|-----|
| 1 | Deltra Clark | | NC | |

**Result Details**

| Name: | Deltra Clark | Race: | |
|-------|--------------|-------|---|
| Age: | | Eye Color: | |
| Date of Birth: | | Hair Color: | |
| Height: | | Scars/Marks: | |
| Weight: | | Source State: | NC |
| Sex: | Female | | |

**Offense Details**

| Court Record ID: | 2007CR011351 |
|------------------|--------------|
| Case Number: | 2007CR011351 |
| Source Name: | |
| Disposition: | DISPOSED |

| Court Name: | | Arrest Agency: | |
|-------------|---|----------------|---|
| Conviction Date: | | Source State: | NC |
| Charge Category: | | Offense Code: | |
| Plea: | | Source: | Criminal Court |
| NCIC Code: | | Offense: | NOT SPECIFIED |
| Offense Code: | | | |
| Case Type: | | | |

| 2 | Deltra Clark | | NC | |
|---|--------------|---|-----|---|

Additionally, the company, from which Health-Pro contended it ran a criminal background check, stated on its website that its services cannot be used to conduct background checks for employees or applicants.

¶ 43     Mr. Bailey offered conflicting testimony at trial concerning why Health-Pro's employment file for Clark only contained this one page, first stating that Health-Pro culled down the file every year because some reports were fifteen pages and then later

saying Health-Pro just prints one page of a criminal background report for the file. Notably, Mr. Bailey also testified at his deposition that he conducted the criminal background check but did not have a specific memory of running the check or seeing the charges and convictions. Yet, he subsequently changed his testimony when deposed as the Rule 30(b)(6) representative of Health-Pro and when he testified at trial.

¶ 44 Health-Pro's criminal background investigation policy also dictated that the criminal history record information received from the criminal background check be stored in a separate locked file in the Human Resource Department, but this was not done. Additionally, the Interviewing and Hiring Process form used by Health-Pro for hiring Clark did not have checks next to the boxes for a criminal background check as reflected below:

37 ☐ Criminal Background Check     Pass ☐    Fail ☐    Pass w/Conditions ☐
Pass w/Conditions: _____

¶ 45 Thus, viewed in the light most favorable to the Keiths, Health-Pro did not run a criminal background check of Clark upon hiring her as a personal care aide in September 2015. It did not check to confirm that she had a driver's license as indicated on her application. Health-Pro simply interviewed Clark after receiving her application and then hired her. Nevertheless, Health-Pro represented on its website that it carefully screened caregivers by calling previous employers and performing

criminal background checks.

¶ 46 As of the date of her hiring, a criminal background check of Clark would have revealed the following: 2007 charge for no operator's license; 2008 found guilty of driving while license revoked; 2009 charge for possession of marijuana; 2009 found guilty of possession of drug paraphernalia; 2010 charge for possession of drug paraphernalia; 2010 charge for communicating threats (dismissed because of noncooperating witness); 2010 found guilty of criminal contempt; and 2011 charge for communicating threats (dismissed because of noncooperating witness). Further, at that time, Clark did not have a valid driver's license.

¶ 47 Clark, however, indicated on her employment application that she had never been convicted of or entered a plea of guilty in a court of law. Thus, as conceded by Health-Pro, Clark lied on her job application about her criminal background. Health-Pro acknowledged that this dishonesty would be concerning to Health-Pro if caught. Clark also identified that she had a driver's license on her application, but she did not have a driver's license at the time of her application, just an identification card.

¶ 48 A few months later in November or December, Health-Pro assigned Clark to work for the Keiths as a personal care aide at their home. The Keiths understood that Health-Pro ran background checks on all their aides, including Clark, and would provide aides that would do a good job and not pose a danger.

¶ 49 Clark was one of the primary aides working for the Keiths. She helped in the

home by cleaning the house, doing laundry, and driving Mrs. Keith for errands. Clark had access to the whole house and could move around the house freely. Through her employment, Clark learned about the Keiths, their valuables, their schedules, their collection of rolled coins, and their spare key.

¶ 50        On or about 25 May 2016, Health-Pro received a letter from Pitt County Child Support Enforcement indicating that a claim against Clark for nonpayment of child support was being pursued.

¶ 51        In 2016, after Clark had been assigned to the Keiths' home, the Keiths' granddaughter and daughter discovered that about $900 of rolled coins were missing. Additionally, $1,260 in cash went missing from Mrs. Keith's dresser. Before the cash went missing, an aide had seen Mrs. Keith remove money from her dresser drawer. Mrs. Keith thought the aide was Clark but was not positive, so she did not accuse her when the cash went missing. Cash also went missing from Mr. Keith's wallet on two occasions.

¶ 52        The Keiths informed Health-Pro about the missing money, and Mr. Bailey on behalf of Health-Pro came to the Keiths' home to discuss in July 2016. The missing money was not located at the meeting (nor was it ever found), but Health-Pro said it would investigate everything and removed Clark and the other aide assigned at the time from servicing the Keiths' home. Health-Pro also agreed to pay back the missing money to the Keiths.

¶ 53        Health-Pro determined that Clark and one other aide were the only aides in the home on the days that money went missing and spoke to them. Yet, Health-Pro did nothing further; it did not run a criminal background check or report the incident to the police.

¶ 54        Fred, the Keiths' son, also met with Mr. Bailey after he learned about the missing money. Mr. Bailey informed Fred that it was either Clark or the other aide but that he had a strong belief that Clark was the one involved. Mr. Bailey assured Fred that neither one of them would be back in his parents' home, and Fred made clear that he did not want Clark back in his parents' home.

¶ 55        Nevertheless, a few weeks later, Health-Pro assigned Clark back to the Keiths' home. Although Health-Pro contended that Fred asked for Clark to return to the home because Clark gave Mrs. Keith better baths than other aides, Fred testified that he disputed Health-Pro's contention, and the Keiths testified that they did not ask for Clark to be reassigned to their home. The Keiths assumed that Health-Pro, after completing its investigation, thought Clark did not pose a threat to the Keiths. Health-Pro also admitted that it did not inform Fred that they were sending Clark back to the home. Thus, viewing the evidence in the light most favorable to the Keiths, Health-Pro made the unilateral decision to reassign Clark as a personal care aide to the Keiths' home after the thefts.

¶ 56        On 9 September 2016, Health-Pro received another letter from Pitt County

Child Support Enforcement.

A few weeks later on 28 September 2016, Clark used the information that she gleaned about the Keiths' home, the comings and goings of Health-Pro aides and the Keiths' family, and their valuables to accomplish a home invasion and robbery. Clark informed her accomplices about everything, including the location of the spare hidden key. Clark also knew and shared with her accomplices that the Health-Pro aide assigned to work that evening, Erica, would leave when her shift ended at 11:00 p.m. and no other family was visiting and staying with the Keiths that evening.

The assigned aide, Erica, did in fact leave in accordance with her shift schedule at 11:00 p.m. on the evening of 28 September 2016. Shortly thereafter, Clark drove her two accomplices in her car to the Keiths' house and dropped them off to complete the home invasion and robbery. Her accomplices dressed in dark clothing and wore masks. Between 11:30 p.m. and 12:00 a.m., the accomplices used the spare hidden key to enter the house and walked into the den where Mr. Keith was watching a movie. Mrs. Keith was in bed. The accomplices disconnected the telephone.

As testified by Mr. Keith, the accomplices knew exactly where to go in the house; they knew where everything was.

One accomplice had a gun and pointed the gun at Mr. Keith and ordered Mr. Keith to lay on the floor face down. The other accomplice walked into the bedroom where Mrs. Keith was lying in bed and took from the bed stand the .32 caliber

Harrison and Richardson pistol belonging to Mr. Keith. The originally armed accomplice found Mr. Keith's ATM card in one of his desk drawers and started waiving it around like it was something for which he was searching. Additionally, while in the home, the other accomplice stole the Keiths' two boxes of rolled coins, totaling $500. The Keiths had stored the boxes in a black bag under Mr. Keith's work desk in the den of their home. One of the accomplices also told Mrs. Keith that she should be sure to mention the name of Erica.

The originally armed accomplice forced Mr. Keith at gunpoint to drive him to an ATM. During the drive to the ATM, the accomplice asked Mr. Keith if he had a worker that comes over to the home named Erica. After Mr. Keith answered affirmatively, the accomplice told Mr. Keith that he needed to fire Erica because she left the door open. Arriving at the ATM around 12:30 a.m., the accomplice forced Mr. Keith to withdraw a thousand dollars. The accomplice then ordered Mr. Keith to drive him to an elementary school, where the accomplice got out of the car and ran away.

Clark picked up both accomplices along with the stolen cash, coins, and gun. Thereafter, she and the accomplices took her car to Walmart to convert the stolen coins into cash by using a Coinstar machine at around 1:00 a.m.

Health-Pro terminated Clark after it identified her in the video footage from the police showing the conversion of the coins to cash at the Coinstar machine.Only after the home invasion and robbery and after firing Clark did Health-Pro run a

criminal background check on Clark.

¶ 64　　　　After undertaking an analysis of the evidence and considering it in the light most favorable to the Keiths, we find that there is evidence to support each element of the Keiths' cause of action and that the motion for directed verdict and subsequent motion for judgment notwithstanding the verdict should be denied. *See Abels v. Renfro Corp.*, 335 N.C. at 215.

¶ 65　　　　Here, the Keiths pursued a negligence claim against the employer of the intentional tortfeasor, Health-Pro, premised on Health-Pro's own negligence in hiring, retaining, and/or assigning Clark, the intentional tortfeasor, to work as a personal care aide at their home. Given that the Keiths' claim relied on negligence by the employer in hiring, retaining, and/or assigning an employee, our precedent recognizes this claim under the theory of liability known as negligent hiring, or more commonly framed as a claim for negligent hiring. While the elements of negligence are a legal duty, breach, and injury proximately caused by the breach, appellate precedent further defines the contours of these elements in specific contexts as previously discussed. Thus, when a plaintiff alleges an employer negligently hired, retained, or supervised an employee, and seeks recovery from the employer for injury caused by the employee, the *Medlin* elements for negligent hiring and the *Little* nexus requirement for duty must be satisfied to show a negligence claim in this context.

¶ 66　　　　Therefore, to survive a motion for directed verdict or judgment

notwithstanding the verdict for their negligence claim, the Keiths had to present evidence to support each element set forth in *Medlin* and to support a nexus between the employment and the injury as required by *Little*.[6] The evidence when viewed in the light most favorable to the Keiths, as summarized previously, satisfied the elements in *Medlin* and the nexus requirement in *Little*. In addition to evidence supporting each of the elements, there is enough distinguishing this case from *Little* and enough similarity with *Lamb* to preclude our precedent from foreclosing the claim as a matter of law.

¶ 67 Unlike *Little*, the evidence viewed in the light most favorable to plaintiffs suggests a sufficient nexus between the injurious act and employment relationship to create a duty. The plaintiffs in this case were daily customers of the defendant employer and had been for years. The defendant employer assigned the intentional tortfeasor employee to work for the plaintiffs inside plaintiffs' home. Thus, defendant employer participated in the meeting between the intentional tortfeasor employee and the plaintiffs and gained financially from their continued meeting. When viewed in the light most favorable to the Keiths, the intentional tortfeasor employee also injured the plaintiff customer, the Keiths, by disclosing and using the intel she gained through her employment to orchestrate a robbery at the intentional tortfeasor

---

[6] Since we conclude that the Keiths' claim is one of negligent hiring pursuant to our precedent, in this particular case liability under a negligence theory is not available, and, thus, we do not address its application.

employee's place of employment, the Keiths' home.

¶ 68        When the evidence is viewed in the light most favorable to the Keiths, the intentional tortfeasor employee was skilled at her work but incompetent to work for vulnerable customers in the customers' home without supervision by another, rendering this case similar to *Lamb. See Lamb*, 128 N.C. at 363. In *Lamb*, the defendant's supervisor had command over the department in which plaintiff, a ten-year-old boy, worked as floor sweeper. *Id.* at 362. The supervisor shoved plaintiff causing him injury, and plaintiff sued the supervisor's employer. *Id.* at 361–62, 365. While there was no evidence of the unskillfulness of the supervisor, he had treated the plaintiff poorly the day before the injury and had a general reputation for his cruelty and temper. *Id.* at 362. This Court concluded that "the evidence shows that he was unfit and incompetent to perform the duties of supervising children and the help under him by reason of his cruel nature and high temper." *Id.* at 363. Given the foregoing, this Court found that the trial court erred by not submitting the case to the jury and reversed the motion dismissing the case for nonsuit. *Id.* at 361–62.

¶ 69        In this case, evidence concerning the falsities in Clark's employment application, Health-Pro's belief that she committed the prior thefts, and the particulars of her criminal background support the inference that Health-Pro knew or should have known of Clark's incompetence for her assignment to the Keiths' home. *See id.* at 362. Health-Pro's personal care aides served elderly and vulnerable

adults and by the nature of their work gained information about their clients' daily routine, personality, finances, and home and were not supervised while in the home. The Keiths, in fact, retained Health-Pro because Mr. Keith needed an at-home-care provider after his heart surgery and throughout their engagement of Health-Pro's services were elderly and with serious health issues and limited mobility.

¶ 70 In addition to the foregoing, evidence also supports the foreseeability of the injury to the Keiths from such incompetence. "Proximate cause is a cause which in natural and continuous sequence produces a plaintiff's injuries and one from which a person of ordinary prudence could have reasonably foreseen that such a result or some similar injurious result was probable." *Murphey v. Ga. Pac. Corp.*, 331 N.C. 702, 706 (1992). "It is not necessary that a defendant anticipate the particular consequences which ultimately result from his negligence. It is required only that a person of ordinary prudence could have reasonably foreseen that such a result, *or some similar injurious result*, was probable under the facts as they existed." *Sutton v. Duke*, 277 N.C. 94, 107 (1970) (cleaned up).

¶ 71 In this matter, Health-Pro acknowledged that it must discipline employees when Health-Pro knows the employee did something out of compliance because absent discipline, there is a risk that the conduct would get worse. Health-Pro also knew or should have known that Clark was under financial strain on account of the child support enforcement letters and that Clark may retaliate against the Keiths for

disclosing the prior thefts given particulars in her criminal background, including charges of communicating threats and a conviction for criminal contempt. Health-Pro further knew or should have known that Clark committed prior thefts in the Keiths' home. Additionally, because of their age, medical conditions, and limited mobility, the Keiths were vulnerable to adverse conduct against them in their home by an incompetent Health-Pro employee. Thus, when viewed in the light most favorable to the Keiths, a person of ordinary prudence could have reasonably foreseen that as a result of Health-Pro's negligent hiring, the home invasion and robbery of the Keiths' home or some similar injurious result was probable and that the trauma from such event would injure the Keiths.

¶ 72        Thus, in this case, the jury, not the court, must decide the outcome of the Keiths' claim. The Court of Appeals in this matter erred by not considering the evidence in the light most favorable to the Keiths, just as Health-Pro's arguments urge us to do. Health-Pro contends that Clark's actions bore no relationship to her employment and no action or inaction by Health-Pro proximately caused the Keiths' injuries because "[a]ny information Clark learned about [the Keith]s' home on the job could have been ascertained just as easily by others watching the home from the street." The jury could have agreed with Health-Pro and weighed the evidence in its favor but given the testimony and evidence before the trial court supporting a contrary interpretation of the facts, this argument cannot justify judgment in Health-

Pro's favor as a matter of law. We must view all of the evidence which supports the Keith's claim as true and consider the evidence in the light most favorable to the Keiths, giving them the benefit of every reasonable inference that may legitimately be drawn therefrom and resolving contradictions, conflicts, and inconsistencies in their favor. *Turner*, 325 N.C. at 158. Therefore, we conclude that the Court of Appeals erred by reversing the trial court and remanding for entry of judgment in favor of Health-Pro.

## B. Jury Instructions

¶ 73        "In evaluating the validity of a party's challenge to the trial court's failure to deliver a particular jury instruction, 'we consider whether the instruction requested is correct as a statement of law and, if so, whether the requested instruction is supported by the evidence.' " *Chisum v. Campagna*, 376 N.C. 680, 2021-NCSC-7, ¶ 52 (quoting *Minor v. Minor*, 366 N.C. 526, 531 (2013)). When the requested jury instruction does not accurately state the applicable law, even if from a North Carolina Pattern Jury Instruction, the trial court does not err by failing to the instruct the jury as requested. *Id.* ¶ 54.

¶ 74        In this matter, the trial court proposed using the North Carolina Pattern Jury Instructions on negligence, specifically 102.10, 102.11, 102.19, and 102.50. Health-Pro counsel objected and requested instead Pattern Jury Instruction 640.42. The requested instruction, however, does not accurately state the applicable law.

¶ 75          First, as previously discussed, this Court has not adopted the factors discussed in *Little* as elements necessary to prove a claim for negligent hiring. Thus, the requested instruction as reproduced below is an inaccurate statement of the law.

> First, the plaintiff must prove that the defendant owed the plaintiff a legal duty of care. This means that the plaintiff *must* prove that Deitra Clark and the plaintiff were in places where each had a right to be when the wrongful act occurred, that the plaintiff encountered Deitra Clark as a direct result of her employment by the defendant, and that the defendant *must* reasonably have expected to receive some benefit, even if only potential or indirect, from the encounter between Deitra Clark and the plaintiff.

(emphasis added).

¶ 76          While the *Little* factors are relevant in assessing whether an employer has a legal duty to a third party for its employee's intentional torts as exemplified by the analysis conducted in *Little* and in this opinion, *Little* did not hold that they "must" be proven by the plaintiff. *Little*, 171 N.C. App. at 588–89.

¶ 77          Second, the instruction concerning the employee's incompetence is not an accurate statement of the law in this case. The Keiths have not contended, nor does the evidence support, that Clark lacked the physical capacity, natural mental gifts, skill, training, or experience needed for her job or that Clark previously committed acts of carelessness or negligence. As recognized in *Lamb*, incompetence and unfitness for employment is *not* so limited; incompetence and unfitness can exist on account of the employee's disposition, such as the cruel nature and high temper of the

supervisor of children as in *Lamb*. 128 N.C. at 363; *see also Walters*, 163 N.C. at 542 ("[I]t may be well to note that this term, incompetency, is not confined to a lack of physical capacity or natural mental gifts or of technical training when such training is required, but it extends to any kind of unfitness which renders the employment or retention of the servant dangerous to his fellow-servant[.]" (cleaned up)).

¶ 78        In this case, the incompetence alleged and supported by the evidence when viewed in the light most favorable to the Keiths is Clark's dishonesty and propensity to steal and break the law. Thus, the requested instruction as reproduced below would not have been proper in this case.

> Second, the plaintiff must prove that Deitra Clark was incompetent. This means that Deitra Clark was not fit for the work in which she was engaged. Incompetence may be shown by inherent unfitness, such as the lack of physical capacity or natural mental gifts, or the absence of skill, training or experience.
>
> Incompetence may also be inferred from previous specific acts of careless or negligent conduct by Deitra Clark, or from prior habits of carelessness or inattention on the part of Health-Pro Home Care Services, Inc. in any kind of work where careless or inattentive conduct is likely to result in injury. However, evidence, if any, tending to show that Deitra Clark may have been careless or negligent in the past may not be considered by you in any way on the question of whether Deitra Clark was negligent on the occasion in question, but may only be considered in your determination of whether Deitra Clark[ ]was incompetent, and whether such incompetence was known or should have been known to the defendant.

¶ 79        Because Health-Pro's requested instruction was not an accurate statement of

the law, we agree with the dissent in the Court of Appeals that it would have been inappropriate in this case and that the trial court did not err by denying the request. However, as we have concluded that the Keiths' claim was a claim for negligence dependent on a theory of negligent hiring, requiring satisfaction of the *Medlin* elements and *Little* nexus requirement, we do not endorse the use of the generic common law negligence instruction in a case substantially similar to this matter. This Court has refused and continues to "refuse to make employers insurers to the public at large by imposing a legal duty on employers for victims of their [employee]s' intentional torts that bear no relationship to the employment," *Little*, 171 N.C. App. at 588–89, *aff'd per curiam*, 360 N.C. 164 (2005), and the generic common law negligence instructions fail to account for our holdings to this effect.

¶ 80        Where our precedent requires an element to support a claim or theory, the jury should be instructed to this effect. *Cf. Calhoun v. State Highway & Pub. Works Comm'n*, 208 N.C. 424, 426 (1935) ("The rule of practice is well established in this jurisdiction that when a request is made for a specific instruction, correct in itself and supported by evidence, the trial court, while not obliged to adopt the precise language of the prayer, is nevertheless required to give the instruction, in substance at least[.]"). Nevertheless, under current law, an argument concerning an error in the jury instructions must be preserved for review by this Court by tendering a requested instruction that is an accurate statement of the law and that is supported by the

evidence. *See Chisum*, 2021-NCSC-7, ¶ 52. Since we conclude that the trial court did not err in denying Health-Pro's requested jury instructions because the requested jury instruction was not an accurate statement of the law, we reverse the Court of Appeals' holding to the contrary.[7]

## IV. Conclusion

We agree with the Court of Appeals that plaintiffs' negligence claim was dependent on a theory of negligent hiring, which is commonly plead as a negligent hiring claim. However, the evidence, taken in the light most favorable to plaintiffs, was sufficient as a matter of law to be presented to the jury. There was evidence to support each element of the claim, the *Medlin* elements, and the *Little* nexus requirement. Therefore, the Court of Appeals erred by reversing the judgment in favor of plaintiffs and by remanding to the trial court for entry of an order granting defendant's motion for judgment notwithstanding the verdict. Further, the Court of Appeals misinterpreted precedent from *Little*, and under a proper reading of that case and other precedent, the jury instruction requested by defendant was not an accurate statement of the law. Therefore, the Court of Appeals also erred by holding that the trial court erred by denying defendant's requested instruction. Accordingly, we reverse the Court of Appeals' decision.

---

[7] Given our holding, it is recommended that the North Carolina Pattern Jury Instruction Committee promptly withdraw N.C.P.I.–Civil 640.42 (2009) and revise it consistent with this opinion.

REVERSED.

Chief Justice NEWBY concurring in part and dissenting in part.

I agree with the majority that plaintiffs' claim was one for negligent hiring and that to prove a claim for negligent hiring, a plaintiff must "present evidence to support each element set forth in *Medlin* [*v. Bass*, 327 N.C. 587, 398 S.E.2d 460 (1990)] and to support a nexus between the employment and the injury as required by *Little* [*v. Omega Meats I, Inc.*, 171 N.C. App. 583, 615 S.E.2d 45 (2005)]." The majority also properly holds that in the light most favorable to the plaintiffs, the evidence was sufficient to submit the case to the jury on a negligent hiring theory. Moreover, the majority correctly concludes that N.C. Pattern Jury Instruction 640.42 wrongly uses the *Little* factors to define the required legal duty and improperly focuses on an employee's "incompetence" as opposed to the employee's "unfitness." Finally, I agree that when a plaintiff presents a negligent hiring claim, a trial court errs by instructing the jury on ordinary negligence instead of negligent hiring. I write separately, however, because I would hold that the trial court's failure to give a negligent hiring instruction prejudiced defendant such that defendant is entitled to a new trial. Accordingly, I concur in part and dissent in part.

"According to well-established North Carolina law, a party's decision to request the delivery of a particular instruction during the jury instruction conference suffices to preserve a challenge to the trial court's refusal to deliver that instruction to the jury." *State v. Benner*, 380 N.C. 621, 2022-NCSC-28, ¶ 32; *see also* N.C. R. App. P.

10(a)(2) (2021) ("A party may not make any portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects thereto before the jury retires to consider its verdict, stating distinctly that to which objection is made and the grounds of the objection."). "It is the duty of the court to charge the law applicable to the substantive features of the case arising on the evidence without special request and to apply the law to the various factual situations presented by the conflicting evidence." *Griffin v. Watkins*, 269 N.C. 650, 653, 153 S.E.2d 356, 359 (1967) (quoting 4 Strong's N.C. Index: *Trial*, § 33, at 331 (1961)). "A charge which fails to submit one of the material aspects of the case presented by the allegation and proof is prejudicial." *W. Conf. of Original Free Will Baptists of N.C. v. Miles*, 259 N.C. 1, 13, 129 S.E.2d 600, 607 (1963) (quoting 4 Strong's N.C. Index: *Trial*, § 33, at 331–32 (1961)).

¶ 84    To show ordinary negligence, a plaintiff must show "(1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." *Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006). The tort of negligent hiring, which this Court has recognized for over a century, focuses on whether an employee was unfit for the work the employee was hired to perform. *See Lamb v. Littman*, 128 N.C. 361, 362, 38 S.E. 911, 911 (1901). In *Lamb*, we considered whether an owner of a mill could be liable under a theory of negligent hiring when a supervisor assaulted a ten-year-old employee. *Id.* We noted that "the evidence show[ed] that [the

supervisor] was unfit and incompetent to perform the duties of supervising children and the help under him by reason of his cruel nature and high temper," *id*. at 363, 38 S.E. at 912, and that this unfitness "ought to have been known to defendant," *id*. at 362, 38 S.E. at 911. We further stated that

> [w]e do not wish to be understood as holding that the [employer] is generally an insurer of the good conduct of his representative, or an insurer against his violence resulting from his own malice or ill will, or sudden outbursts of temper, although in charge of the [employer]'s business; but only when he puts in such representative as is by him known, or ought to have been known, to be violent and mean, and the injury is the natural result of such character.

*Id*. at 364, 38 S.E. at 912. Accordingly, because the supervisor was unfit, and the employer should have known of the supervisor's unfitness, the employer could be liable under a negligent hiring theory. *Id*. at 364–65, 38 S.E. at 912.

¶ 85        We again addressed the tort of negligent hiring in *Walters v. Durham Lumber Co.*, 163 N.C. 536, 538, 80 S.E. 49, 50 (1913). We stated that an employer "is held . . . to the exercise of reasonable care in selecting employees who are competent and fitted for the work in which they are engaged." *Id*. at 541, 80 S.E. at 51. Thus, we held that

> [t]he burden of proving negligence in selecting or continuing an unfit [employee] is upon the plaintiff. He must prove (1) the specific negligent act on which the action is founded, which may, in some cases, but not generally, be such as to prove incompetency, but never can, of itself, prove notice to the [employer]; (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either

> actual notice to the [employer] of such unfitness or bad habits, or constructive notice, by showing that the [employer] could have known the facts had he used ordinary care in oversight and supervision, or by proving general reputation of the [employee] for incompetency or negligence; and (4) that the injury complained of resulted from the incompetency proved.

*Id*. (internal quotation marks omitted). We further clarified that "incompetency" is not limited "to a lack of physical capacity or natural mental gifts or of technical training when such training is required, but it extends to any kind of unfitness which renders the employment or retention of the [employee] dangerous." *Id*. at 542, 80 S.E. at 52 (internal quotation marks omitted). Thus, we held that whether an employee was unfit and whether an employer had notice of the unfitness were questions for the jury. *Id*. at 543, 80 S.E. at 52.

¶ 86 In *Lamb* and *Walters*, this Court referred to the "incompetence" of the employee. The term "incompetent" is now often understood to refer to a person's mental fitness. *See Incompetent Person,* Ballentine's Law Dictionary (3d ed. 2010) ("[O]ne lacking competency, physical or mental. Usually having reference in the law to an insane or feeble-minded person."). As used in *Lamb* and *Walters*, however, "incompetent" is synonymous with "unfitness." *See Lamb*, 128 N.C. at 363, 38 S.E. at 912 ("[T]he evidence show[ed] that [the employee] was unfit and incompetent to perform the duties of supervising children and the help under him . . . ."); *Walters*, 163 N.C. at 542, 80 S.E. at 52 (holding that "incompetency" properly "extends to any

kind of unfitness which renders the employment or retention of the [employee] dangerous." (internal quotation marks omitted)); *see also Incompetency*, Black's Law Dictionary (1st ed. 1891) ("Lack of ability . . . or fitness to discharge the required duty."). Accordingly, the proper inquiry is whether an employee was unfit for the work the employee was hired to perform.

¶ 87 During the jury charge conference, the trial court proposed using the pattern jury instructions for common law negligence. Defendant twice objected to the trial court's proposed instructions and requested that the trial court instead use N.C. Pattern Jury Instruction 640.42, titled "Employment Relationship—Liability of Employer for Negligence in Hiring, Supervision, or Retention of an Employee." In addition to the elements from *Medlin*, that instruction included the disputed factors from *Little* and a requirement that the employee be found "incompetent." These latter two requirements, which this Court has now correctly deemed too inflexible, made the defendant's requested jury instruction partially inappropriate for this case. The trial court, however, declined to use any aspect of defendant's requested jury instruction on negligent hiring. Instead, the trial court instructed the jury only on ordinary common law negligence. Defendant then renewed its objection after the trial court instructed the jury. In response, the trial court stated, "I'll, again, overrule [the objections], but they are preserved for the record." Thus, defendant requested a specific instruction during the jury charge conference and objected to the trial court's

instructions both before and after the instructions were given. Accordingly, defendant's objections to the jury instructions were properly preserved for appellate review.

¶ 88    The majority has properly "concluded that the Keiths' claim was a claim for negligence dependent on a theory of negligent hiring." As the majority also notes, "[w]here our precedent requires an element to support a claim or theory, the jury should be instructed to this effect." By instructing only on ordinary common law negligence, however, the trial court did not require the jury to find: (1) that Clark was unfit for the work she was hired to perform; (2) that defendant had notice of Clark's unfitness; or (3) that there was a nexus between the employment relationship and the injury. These are factual questions that must be resolved by a jury. As the majority notes, "in this case, the jury, not the court, must decide the outcome of the Keiths' claim." Because the jury was not properly instructed on the elements of negligent hiring and retention, defendant was prejudiced. Accordingly, I would reverse the Court of Appeals and remand this case for a new trial. Therefore, I respectfully concur in part and dissent in part.

Justice BERGER dissenting.

This Court has recognized the law's reluctance to hold individuals and organizations responsible for the criminal acts committed by others. *See Stein v. Asheville City Bd. Of Educ.*, 360 N.C. 321, 328, 626 S.E.2d 263, 268 (2006). Where no duty exists, liability should not be imposed. Today's opinion, however, increases the business community's exposure to liability for the intentional and unforeseeable acts of their employees. Because the Court of Appeals properly reversed and remanded to the trial court for entry of judgment notwithstanding the verdict in favor of defendant, I respectfully dissent.

To establish a claim for negligence, a plaintiff must show "the existence of a legal duty or obligation, breach of that duty, proximate cause and actual loss or damage." *Little v. Omega Meats I, Inc.* 171 N.C. App. 583, 586, 615 S.E.2d 45, 48 (2005). "[T]he threshold question is whether [a] plaintiff[ ] successfully allege[s] [a] defendant had a legal duty to avert the attack on [plaintiff]." *Stein*, 360 N.C. at 328, 626 S.E.2d at 267. Absent this legal duty, a defendant cannot be liable to a plaintiff for negligence. This Court has recognized that, "[n]o legal duty exists unless the injury to the plaintiff was foreseeable and avoidable through due care." *Id.* Moreover, foreseeability generally depends on the facts of the particular case. *Id.* at 328, 626 S.E.2d at 267–68.

¶ 91        In cases where a plaintiff asserts liability founded on a defendant's relationship to a third party who injured them, the establishment of a legal duty hinges on whether defendant held a special relationship with the third party. *See Id.* at 329, 626 S.E.2d at 268. This Court explained further that:

> [N]o special relationship exists between a defendant and a third person unless (1) the defendant knows or should know of the third person's violent propensities and (2) the defendant has the ability and opportunity to control the third person at the time of the third person's criminal acts.

*Id.* at 330, 626 S.E.2d at 269. Under a negligence theory, employment alone does not establish a special relationship.

¶ 92        In *Stein*, the plaintiffs brought a negligence claim against the defendant for the actions of third parties. *Id.* at 328, 626 S.E.2d at 268. There, the plaintiffs rested their claim on the failure of the defendant, a special school for behaviorally and emotionally handicapped children, to take reasonable steps to stop two gunmen who were students at the school. *Id.* This Court noted that the plaintiffs' asserted liability depended on whether the defendant's relationship with the gunmen amounted to a special relationship which would impose a duty on the defendant. *Id.* at 329, 626 S.E.2d at 268. Because the shooting occurred "entirely outside of [the] defendant's custody" as it took place well after normal school hours and not on property belonging to the defendant, this Court concluded that the defendant did not owe the plaintiff a legal duty to prevent the shooting. *Id.* at 332, 626 S.E.2d at 270.

¶ 93          Here, the claim against defendant based on the actions of Clark similarly hinges on whether a legal duty existed. Defendant could not have known or reasonably anticipated that Clark was a violent individual who would engage in a home invasion and armed robbery. After all, at worst, Clark's previous convictions were for non-violent misdemeanors, and defendant had not received any complaints concerning Clark's work or character. Moreover, at the time of the robbery, defendant had no ability or authority to exercise supervision or control over Clark's actions. The robbery in the instant case took place outside of Clark's normal working hours. An employer is not the guarantor of employee conduct at all times and for all purposes. Defendant did not and could not have reasonably anticipated that Clark would orchestrate a home invasion and armed robbery against one of defendant's clients. Because Clark's intentional criminal acts were not foreseeable, defendant did not owe plaintiffs a legal duty.

¶ 94          For similar reasons, I would also conclude that the Court of Appeals correctly determined that plaintiffs' evidence was insufficient to establish a claim upon the theory of negligent hiring. As stated above, before an employer may be held liable to a plaintiff for negligent hiring, it must be shown that the employer owes the plaintiff a legal duty. *Little*, 171 N.C. App. at 587, 615 S.E.2d at 48.

¶ 95          The Court of Appeals in *Little* delineated three factors to determine when an employer owes a duty to a plaintiff under a negligent hiring theory:

> (1) [T]he employee and the plaintiff must have been in places where each had a right to be when the wrongful act occurred; (2) the plaintiff must have met the employee as a direct result of the employment; and (3) the employer must have received some benefit, even if only potential or indirect, from the meeting of the employee and the plaintiff.

171 N.C. at 588, 615 S.E.2d at 49. Courts decline to hold employers "liable for the acts of their . . .employees under the doctrine of negligent hiring or retention when *any one* of these three factors [i]s not proven." *Id.* at 588, S.E.2d at 49.

¶ 96 Here, Clark did not have a right to be in plaintiff's home and was not acting as a health care aide at the time the home invasion and robbery were committed. In addition, defendant has not received any benefit from Clark's actions in orchestrating the robbery. To the contrary, defendant's reputation is undoubtedly damaged due to Clark's actions. While Clark did indeed meet plaintiffs through her employment, all three factors must be met for a duty to be established. As a result, I would affirm the Court of Appeals.